THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| PATRICIA MITCHELL MARZETT, | ) | C/A No. 2:14-CV-3932-RMG-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| CHARLESTON COUNTY SCHOOL | ) | OF THE MAGISTRATE JUDGE |
| DISTRICT and | ) | |
| JAMES WINBUSH, | ) | |
| MELVIN MIDDLETON, individually and | ) | |
| in their official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

The plaintiff, Patricia Mitchell Marzett ("Plaintiff"), a teacher formerly employed by the

Defendant Charleston County School District ("CCSD"), filed this *pro se* action *in forma*

*pauperis* under 28 U.S.C. § 1915 against the CCSD, James Winbush ("Winbush"), and Melvin

Middleton ("Middleton"), individually and in their official capacities.  (Compl., Dkt. No. 1.)  The

Plaintiff alleged claims of race discrimination, gender discrimination, and retaliation in violation

of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17 ("Title

VII") and 42 U.S.C. § 1983, age discrimination in violation of the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"), and disability discrimination in violation of

the Americans with Disabilities Act, 42 U.S.C. §§ 12101-83 ("ADA").  More specifically, the

Plaintiff alleged: (1) race and gender discrimination related to events that occurred during the

2010-2011 school year; (2) race, age, disability, and gender discrimination in connection with the

non-renewal of her teaching contract for the 2012-2013 school year; and (3) that during the time

1

she was subsequently employed by a staffing agency, CCSD retaliated against her when it withdrew an offer of employment which it had made to her.  (Compl. ¶¶ 11-16; 22, 26, 33-34, 37-45.)  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case presents a federal question. Venue is proper because the events at issue occurred in this District.  28 U.S.C. § 1391.

This case was referred to a United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(g) (D.S.C.), which provides for such referrals in all "employment discrimination cases invoking federal statutes[.]" After CCSD, Winbush, and Middleton moved for partial dismissal of the action, the court issued a Report and Recommendation ("Report").  (Dkt. No. 28.)  The District Court adopted the Report as the Order of the Court, and dismissed any claims that had accrued during the 2010-2011 school year, dismissed Middleton from the action, and dismissed Winbush insofar as he was named in his individual capacity.  (Dkt. No. 31 at 4-5.)  Thereafter, remaining before the court were the Plaintiff's claims of race, age, disability, and gender discrimination in connection with the non-renewal of her teaching contract for the 2012-2013 school year, asserted against CCSD pursuant to Title VII and against Winbush in his official capacity, pursuant to § 1983, and the Plaintiff's claim of retaliation against CCSD.

On June 3, 2016, CCSD and Winbush filed a Motion for Summary Judgment on the remaining claims.  (Dkt. No. 49.)  On June 6, 2016, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the dismissal procedure and the possible consequences if she failed to adequately respond to the Defendants' Motion.  (Dkt. No. 51.)  The Plaintiff timely filed a Memorandum in Opposition to Motion for Summary Judgment, followed

by an Amended Memorandum in Opposition to Motion for Summary Judgment, the Defendants filed a Reply in Support of Their Motion for Summary Judgment, and the Plaintiff filed a Reply. (Dkt. Nos. 55, 56, 57, 58.)  For the reasons stated herein, the undersigned recommends that the Defendants' Motion for Summary Judgment be granted.

## FACTS

### Background

The Plaintiff is a 59 year old African American female who suffers from back, hip and knee disabilities.  (Compl. ¶¶ 5, 20, 26, 30; Pl. Dep. 131:4, 131:10-11.)  She is certified to teach elementary education and middle level mathematics and was employed as a continuing contract teacher by the CCSD from 1997 through 2012.  (Compl. ¶¶ 5, 6, 10, 31, 32.)  At all times relevant to the complaint, the Plaintiff taught at Sanders-Clyde Elementary/Middle School ("SCEMS").  (Compl. ¶¶ 9-10.)  During the time she taught at SCEMS, she had been placed on a SAFE-T formal evaluation for the 2005-2006 school year and again for the 2006-2007 school year.[1]  (Pl. Dep. 17:8-13, 26:9-12, Dkt. No. 61-1.[2])

Although the court is aware that claims accruing during the 2010-2011 school year were dismissed by the District Court's prior order, the relevant historical facts of the case are set forth to provide background to the issues presently before it.  On or about May 14, 2010, the Plaintiff

---

[1] The SAFE-T formal evaluation process was created by the South Carolina Department of Education.  (Pl. Dep. 28:14-17, Dkt. No. 61-1; *see also* "SAFE-T: A Guide for Teachers and Evaluators," Pl. Dep. Ex. 12, Dkt. No. 61-13.)  Prior to the beginning of the year in which teachers would be evaluated, they were invited to attend a training/orientation session where the requirements and time lines were discussed.  (Pl. Dep. 29:9-20, Dkt. No. 49-1.)  The SAFE-T evaluation is divided into two parts–preliminary and formal.  (*Id.*).

[2] At the court's request, the Defendants filed a complete copy of the Plaintiff's deposition.  (Dkt. No. 61-1.)  In this Report and Recommendation, the court will cite to the complete copy, instead of citing to the deposition excerpts attached to the Defendants' Motion for Summary Judgment.

received a letter from Middleton, SCEMS's principal, notifying her that she would be placed on a SAFE-T formal evaluation for the 2010-2011 school year "[b]ased on professional behaviors and student data."  (Compl. ¶¶ 9, 11; Pl. Dep. 31:10-25, Pl. Dep. Ex. 7, Dkt. No. 61-8.)  Middleton's letter specifically stated:

> We hope you take advantage of the assistance provided through formal evaluation. Should you not improve in the areas noted above and meet the standards of the formal evaluation process, please be aware that you may be recommended for dismissal.

(Pl. Dep. Ex. 7, Dkt. No. 61-8.)  After the Plaintiff learned that she had been placed on formal evaluation, she asked Winbush, CCSD's Associate Superintendent, to transfer her to another school because she knew she would not get a fair evaluation under Middleton, but Winbush told her she was not allowed to transfer while on formal evaluation. (Compl. ¶¶ 12-13; Pl. Dep. 45:12-23, 46:20-24, 47:11-14.)  Winbush was prohibited from transferring her to another school pursuant to CCSD Policy GCKAA, which provided:  "Teachers are not eligible for a transfer if they . . . have been recommended for formal evaluation."  (Bates Aff. ¶ 19, Dkt. No. 49-6; Bates Aff. Ex. 1, Dkt. No. 49-6 at 6.)

During the 2010-2011 school year at SCEMS, the Plaintiff taught mathematics to students in the sixth and seventh grade.  (Pl. Dep. 54:17-22.)  On January 21, 2011, Lori Bates, a Teacher Quality Team Associate with the CCSD, notified the Plaintiff that her SAFE-T formal evaluation for the 2010-2011 school year would be discontinued due to "limitations of time," but that if she were re-employed with CCSD for the 2011-2012 school year, she would be placed on formal evaluation for that school year.  (Pl. Dep. 57:24–58:8-11; *see also* Letter, Dkt. 49-7.)  The record reflects that all formal evaluations at SCEMS during the 2010-2011 school year were

4

discontinued due to time limitations that resulted from personnel changes at SCEMS, such as Middleton's departure from the school.  (Bates Aff. ¶ 15, Dkt. No. 49-6; Pl. Dep. 59:18-21.)

Before the 2011-2012 school year began, Anthony Dixon, who had been named the Principal of SCEMS, telephoned the Plaintiff and offered her the opportunity to switch from teaching middle school at SCEMS to teaching at SCEMS's Third Grade Academy.  (Dixon Aff. ¶¶ 1, 3, Dkt. No. 49-8.)  Dixon made this offer because the Plaintiff "would have fewer students in her class, she would be teaching less complicated concepts, and she would have the benefit of having a teacher's assistant that she would share with the other third grade teacher."  (Dixon Aff. ¶ 4, Dkt. No. 49-8.)  Dixon's intention "was to assist her and help her successfully complete her formal evaluation."  (Dixon Aff. ¶ 4, Dkt. No. 49-8.)  In July 2011, the Plaintiff accepted the position at the Third Grade Academy after receiving assurance from Dixon that she would receive the assistance she needed to pass her formal evaluation.  (Pl. Dep. 62:10:–64:7; Dixon Aff. ¶¶ 4-5, Dkt. No. 49-8.)

### The 2011-2012 School Year

During the 2011-2012 school year, the Plaintiff had twelve or thirteen students in her third grade class, and she and the other third grade teacher shared a teacher's assistant.  (Pl. Dep. 64:18-21, 65:5-6, 65:15-22, 66:3-5, 66:15-16.)

On October 10, 2011, SCEMS's Principal Dixon informed the Plaintiff by letter that she was late in turning in her long range plans ("LRPs"), after having been granted two extensions beyond the September 14, 2011 deadline.[3]  (Pl. Dep. Ex. 13, Dkt. No. 61-14.)  Dixon said he

---

[3] The Plaintiff had received a copy of the SAFE-T timeline, which included the deadlines, at an orientation session at the beginning of the school year.  (Pl. Dep. 69:3-12, 70:18-22; *see also* SAFE-T Timeline, 2011-2012, Pl. Dep. Ex. 11, Dkt. No. 61-12.)

could not grant the Plaintiff another extension, so her formal evaluation would proceed with the information he had as of October 10, 2011. (*Id.*). Dixon, as SCEMS's Principal, chaired the Plaintiff's formal evaluation team, which also included April Butler, a Teacher Effectiveness Specialist from the Office of Teacher Quality, and Latisha Vaughn-Brandon, the Principal of North Charleston Elementary School.[4] (*Id.*, *see also* Dixon Aff. ¶ 6, Dkt. No. 49-8; Butler Aff. ¶ 3, Dkt. No. 49-11.) As part of the formal evaluation, Dixon observed the Plaintiff's classroom on six occasions from September through March. (Dixon Aff. ¶¶ 7-8, Dkt. No. 49-8; Dixon Aff. Exs. 1-6, Dkt. No. 49-8 at 6-21.) In his opinion, the Plaintiff exhibited inadequate instructional delivery, inadequate planning, and ineffective use of instructional time; he concluded that the "students were not progressing and learning." (Dixon Aff. ¶¶ 11-12, Dkt. No. 49-8.) Butler observed the Plaintiff's classroom on five occasions from October through March; she noted that the Plaintiff did not clearly communicate with her students, she did not engage with or challenge the students, she did not demonstrate content competence, she did not implement the Mastery Teaching Model (as required by CCSD), and she failed to submit her LRPs, as required by the formal evaluation. (Butler Aff. ¶¶ 4, 9-12, 16, Dkt. No. 49-11; Butler Aff. Exs. 1-5 & 10, Dkt. No. 49-11 at 6-27 & 41.) Vaughn-Brandon observed the Plaintiff's classroom on four occasions from October to February and reported that the Plaintiff did not communicate expectations to the students prior to their lessons, the classroom climate was very passive, and the students did not seem motivated to learn. (Butler Aff. ¶ 5, Dkt. No. 49-11, Butler Aff. Exs. 6-9, Dkt. No. 49-11 at 28-40.)

---

[4] Dixon, Butler, and Vaughn-Brandon are African-American. (Pl. Dep. 74:7-10.)

After the Plaintiff's preliminary evaluation period, the evaluation team met and unanimously determined that the Plaintiff had met only twelve of the thirty-four key elements of the SAFE-T formal evaluation process, which resulted in the Plaintiff not having successfully completed the preliminary evaluation period. (Dixon Aff. ¶¶ 9-10, Dkt. No. 49-8; Butler Aff. ¶ 7, Dkt. No. 49-11.) Dixon met with the Plaintiff on December 13, 2011 to review the results of the preliminary evaluation. (Pl. Dep. 76:19-22; Pl. Dep. Ex. 14, Dkt. No. 61-15 at 1.) The SAFE-T summary identified four categories, or "Domains," of ADEPT Performance Standards; the Plaintiff had met 4 of 11 "key elements" in the Planning Domain, 2 of 12 key elements in the Instruction Domain, 1 of 6 key elements in the Environment Domain, and 5 of 5 key elements in the Professionalism Domain. (Pl. Dep. Ex. 14, Dkt. No. 61-15 at 1.) The Plaintiff signed the summary form to indicate she had received the results of the evaluation. (Pl. Dep. 77:8-9; *see also* Pl. Dep. Ex. 14, Dkt. No. 61-15 at 1.)

The Plaintiff also prepared a LRP as part of her evaluation; she had turned it in during her preliminary evaluation period. (Pl. Dep. 79:6-159; Pl. Dep. Ex. 15, Dkt. No. 61-16.) Butler told the Plaintiff that she needed to resubmit it because she had left part of it blank. (Butler Aff. ¶ 16; *see also* Pl. Dep. Ex. 15 at 3, Dkt. No. 61-16.) In her deposition, the Plaintiff denied leaving part of the LRP blank. (Pl. Dep. 83:8-21.) According to Butler, the Plaintiff "resubmitted the same LRP [with] copies of the South Carolina state standards and another school's science and social studies pacing guide that were not on rotation with [SCEMS]. These attachments were not responsive to what was requested." (Butler Aff. ¶ 16, Dkt. No. 49-11.)

At some time during the school year, the Plaintiff was provided with a mentor, and with a curriculum coach, and given the opportunity to observe effective teachers. (Dixon Aff. ¶¶ 14-15,

7

Dkt. No. 49-8.)  The Plaintiff testified that her curriculum coach was only "[b]y name."  (Pl. Dep. 97:3-4.)  Melody Herscher, the Plaintiff's mentor and an Instructional Coach with the CCSD, observed the Plaintiff, provided feedback, gave her multiple examples of strategies for improvement, and took the Plaintiff to observe teachers at other schools who demonstrated effective instructional skills.  (Herscher Aff. ¶¶ 1, 6, 8, 10, Dkt. No. 49-13.)  The Plaintiff met with Herscher "several times."  (Pl. Dep. 101:22–102:1.)  Herscher did not observe the Plaintiff accepting or implementing her assistance.  (Herscher Aff. ¶ 11, Dkt. No. 49-13.)

The Plaintiff also was given a Professional Growth and Development Plan ("PGDP"). (Pl. Dep. 91:8–92:6; Pl. Dep. Ex. 16, Dkt. No. 61-17.)  She and Dixon met on October 21, 2011 to review it prior to its implementation on October 24, 2011.  (Pl. Dep. 92:7-9; Dixon Aff. ¶ 16, Dkt. No. 49-8.)  The Plaintiff testified that the purpose of the PGDP was to help her grow and develop professionally; it was divided into "Goals", "Strategies", "Evidence that the supervisor will consider in determining progress/goal accomplishment", and "Level of performance required to indicate satisfactory progress/goal accomplishment".  (Pl. Dep. 92:10-18; Pl. Dep. Ex. 16, Dkt. No. 61-17.)  The Plaintiff agreed that the PGDP stated what was expected of her (Pl. Dep. 93:23–94:1) but testified that she was not provided with the necessary support to meet those goals.  (Pl. Dep. 94:11–95:1.)  At her deposition, the following colloquy occurred:

> Q.  What type of support did you require?
> A.  I'm requiring the support that's on this – that they were supposed to supply me with based on this paperwork.
>
> Q.  What help did you need that you did not receive?
> A.  Whatever help I need.
>
> Q.  Please describe.

8

A.  What help I needed.  Ma'am, I went from teaching middle school mathematics, 6th, 7th and 8th grade, to 3rd grade students; major difference. Anything I ask for, you support me with that.  Tell me–explain to me how I'm supposed to teach the 3rd Grade Academy requirements and fit in social studies and science.  Explain that to me.  That was never explained to me, nor was it ever demonstrated.  Nobody could do that.

            . . .

Q.  What assistance did you request that you were not given?
A.  I requested for someone to tell me how I'm supposed to fit everything into the curriculum that they gave me in addition to all the other surprise things that the school came up with.

Q.  And who did you make that request to?
A.  I made it to Mr. Dixon.

Q.  When did you make that request?
A.  I don't recall the exact date.  During the school year while I was on formal evaluation.

Q.  Is there any other assistance that you requested that you were not given?
A.  I needed some help understanding the leveling system for reading.

Q.  All right.  And did you request that assistance?
A.  Yes, I did.

Q.  To whom?
A.  I requested that to Mr. Dixon, I requested it to Ms. Johngra Brown, and who else – oh, Ms. Stacey Williams and also the other members that was on that team.[5]

Q.  You had a full support team, correct?
A.  No.

Q.  Well, you had a mentor.
A.  I had a mentor name but wasn't nobody mentoring me.

(Pl. Dep. 95:2–97:2.)

---

[5] Johngra Brown was a School Curriculum Coach at SCEMS and the Plaintiff's first mentor.  (Pl. Dep. 94:17-18.)  Stacey Williams was the Assistant Principal at SCEMS.  (Pl. Dep. 127:19-20.)

On December 16, 2011, the Plaintiff met with Dixon to review her PGDP, which had been revised to address the issues identified in the preliminary evaluation.  (Dixon Aff. ¶¶ 13, 17, Dkt. No. 49-8; Dixon Aff. Ex. 12, Dkt. No. 49-8 at 30-32.)  The number of "areas to be addressed" by the Plaintiff increased from four to nine.  (Pl. Dep. 98:22–99:9.)  Dixon "did not observe any improvement" in the Plaintiff's performance after their December meeting.  (Dixon Aff. ¶ 13, Dkt. No. 49-8.)

After the end of the Plaintiff's final evaluation period, the team met on March 13, 2012 and determined that the Plaintiff had met only ten of the thirty-four key elements of the SAFE-T formal evaluation process, which resulted in the Plaintiff not having successfully completed the final evaluation period.   (Dixon Aff. ¶ 20, Dkt. No. 49-8.)  The SAFE-T summary shows that of the four Domains of ADEPT Performance Standards, the Plaintiff had met 4 of 11 key elements in the Planning Domain, 1 of 12 key elements in the Instruction Domain, 1 of 6 key elements in the Environment Domain, and 4 of 5 key elements in the Professionalism Domain.  (Pl. Dep. Ex. 14, Dkt. No. 61-15 at 1.)  The Plaintiff wrote "do not agree" above her signature on the summary form.  (Pl. Dep. 77:4-9; *see also* Pl. Dep. Ex. 14, Dkt. No. 61-15 at 1.)

Around April 3 or 4, 2012, the Plaintiff met with Dixon and Will Suggs, from the CCSD Office of Employee Relations, and Dixon told her he was recommending that her contract not be renewed.  (Pl. Dep. 104:11-15; 104:21–105:23; Dixon Aff. ¶ 23, Dkt. No. 49-8.)  The Plaintiff did not recall being given any reasons for her non-renewal.  (Pl. Dep. 105:25–106:2.)  The Plaintiff reported to work the next day, but did not stay because she had a panic attack; she "wanted to spit on Mr. Dixon because [she] hated him."  (Pl. Dep. 119:1-8, 122:3-19.)  She was absent for the remainder of the school year, first on spring break from April 6 to April 16, and

then on leave pursuant to the Family Medical Leave Act from April 18 to June 4.  (Pl. Dep.
121:8-18, Pl. Dep. Exs. 21 & 22, Dkt. Nos. 61-22 & 61-23 at 2; Dixon Aff. ¶ 23, Dkt. No. 49-8.)
In a letter dated April 4, 2012, Winbush informed the Plaintiff that Dixon had recommended that
her employment contract not be renewed for the 2012-2013 school year due to her "[f]ailure to
meet the requirements of SAFE-T evaluation specifically in the areas of Long Range Planning,
Short Range Planning, Instruction, and Environment."  (Defs.' Ex. 10, Dkt. No. 49-10; Compl. ¶
16.)

The Plaintiff admits that she failed the formal evaluation, but testified she was not
renewed because "it was stated to me long before this letter that I was on the chopping block."
(Pl. Dep. 107:3-5, 107:11-12.)  She testified that Ellen Plaxico, who had helped the Plaintiff
during the evaluation period that had been discontinued (2010-2011) had told her:  "I heard you
were on the chopping block[.]"  (Pl. Dep. 107:11–108:5.)  In addition, the Plaintiff testified:

> I was told that they, meaning the powers that be in [CCSD] . . . don't like to see the
> African American students make gains.  I was told that when they do make gains,
> then that means they need to start getting rid of people.  I was told that they need to
> get rid of teachers that have been around for a long time or that's close to retirement
> because they're making too much money, that they can hire two new teachers for the
> same rate that they're paying an older teacher.

(Pl. Dep. 108:10-21, Dkt. No. 49-1.)  Both Latrea Hutchinson and Kathleen Johnson had told her
that.  (Pl. Dep. 108:22-25.)

The Plaintiff alleges her contract was not renewed due to her race, age, disability, and
gender (Compl. ¶¶ 16, 22, 26, 33, 34) and testified that Winbush, an African-American,
terminated her for these reasons.  (Pl. Dep. 110:11-14, 111:5-25 (race); 115:1-3 (age); 117:7-10
(disability); 112:3-7, 113:14-16 (gender)).

### The Plaintiff's EEOC Charge

On January 16, 2013, Plaintiff filed a charge with the EEOC, alleging race, age, disability, and gender discrimination.  (Dkt. No. 18-2.)  At some point thereafter, the Plaintiff sought employment with Kelly Educational Staffing ("KES"), which referred the Plaintiff to the CCSD for employment.  (Compl. ¶ 39.)  On January 8, 2014, the Plaintiff interviewed with Jennifer Coker, the principal of CCSD's Murray Hill Academy.[6]  (Compl. ¶¶ 40-41.)   Later that day, KES called the Plaintiff to inform her that she had been hired for a position at Murray Hill Academy and was to start on January 13, 2014.  (Compl. ¶ 42.)  On or about January 10, 2014, KES informed the Plaintiff that the job offer had been rescinded.  The Plaintiff alleges that CCSD rescinded the offer in retaliation for filing the EEOC claim.  (Compl. ¶¶ 43-44.)  The Plaintiff received a "Notice of Right to Sue" from the EEOC on July 17, 2014.  (Compl. ¶ 3.)

### STANDARDS OF REVIEW

#### Summary Judgment

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp.*, 477 U.S. at 322-23.  Conversely, the non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary

---

[6] Coker has averred that she was the Principal of Daniel Jenkins Academy in January, 2014.  (Coker Aff. ¶ 1, Dkt. No. 49-14.)

judgment as a matter of law.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A court must take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987).  This does not mean that summary judgment is never appropriate in these cases.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-47 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  There is a genuine issue as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

### The *Pro se* Pleading

The court is required to liberally construe *pro se* documents, *Estelle v. Gamble,* 429 U.S. 97 (1976), holding them to a less stringent standard than those drafted by attorneys, *Hughes v. Rowe,* 449 U.S. 5, 9-10 (1980) (per curiam).  The mandated liberal construction afforded *pro se* pleadings means that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a court may not rewrite a complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999), or construct the plaintiff's legal arguments for him, *Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court, *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  Further, the requirement of liberal

13

construction does not mean that the Court can ignore a clear failure in the pleading to allege facts

which set forth a claim currently cognizable in a federal district court. *Weller v. Dep't of Soc.*

*Servs.,* 901 F.2d 387, 391 (4th Cir. 1990).

## DISCUSSION

### The Plaintiff's Evidence

In her first four causes of action, the Plaintiff alleges her contract was not renewed due to

her race, age, disability, and gender. To prevail on these claims, the Plaintiff must prove that she

was "treated less favorably" because of her race, her age, her disability, or her gender. *See*

*Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005) (citations

omitted).

### The Plaintiff's Evidence of Race Discrimination

The Plaintiff testified she had been discriminated against based on her race because:

> Only African-American female continuing contract teachers were placed on formal
> evaluation. The white teachers, female teachers, who were not performing
> adequately and were not placed on formal evaluation, they didn't have an opportunity
> to fail because they weren't placed on it.

(Pl. Dep. 137:16-22; *see also* Pl. Dep. 111:20-25 ("[T]here were only African-American

teachers, female, placed on formal evaluation; . . . no white continuing contract teachers were

placed on formal evaluation. None of the white teachers were terminated, only black ones.")).

The Plaintiff claims that Winbush discriminated against her on the basis of race "[b]ecause he

allowed only female African American teachers to be placed on formal evaluation." (Pl. Dep

138:18-25.) She explained: "There were only African American continuing contract teachers

placed on formal evaluation.  All three of them were terminated or in some way or another . . . ."
(Pl. Dep. 110:19-23.)

### The Plaintiff's Evidence of Age Discrimination

According to the Plaintiff, Winbush discriminated against her based on her age, as evidenced by "what he said.  My salary–two people could probably–two beginning teachers could be hired based on the salary that I was making."  (Pl. Dep. 115:7-11.)  The Plaintiff did not have "exact evidence" of who had replaced her, except that "[p]eople talk" and she had heard she had been replaced by a "[w]hite young female."  (Pl. Dep. 115:21–116:3.)  The Plaintiff said:  "I can't say who replaced me because if I'm not mistaken, the 3rd Grade Academy was discontinued the next year."  (Pl. Dep. 116:10-12.)

### The Plaintiff's Evidence of Disability Discrimination

The Plaintiff testified that Winbush was motivated not to renew her contract because of her back, hip and knee injuries, because she had trouble standing or sitting for a long period of time, and because she had problems walking up and down the stairs.[7]  (Pl. Dep. 131:2–132:5.)  She had asked Dixon to put her classroom on the first floor, but he denied the request.  (Pl. Dep. 135:9-17.)  The Plaintiff's "classroom was placed on the second floor of the . . . new building . . . where the 3rd Grade could have been located on the . . . first floor as opposed to the second floor."  (Pl. Dep. 118:13-18.)  The Plaintiff  "believe[d] [Winbush] had something to do with [where the classroom was] or he approved it."  (Pl. Dep. 117:21-22.)  When asked whether she had any direct knowledge of Winbush's involvement in that decision, she stated: "I know that the associate superintendent knows everything that goes on in the schools."  (Pl. Dep. 118:5-6.)

---

[7] The Plaintiff admitted she was able to walk up and down the stairs in her two-story home.  (Pl. Dep. 132:15-22.)

15

She testified: "[M]y classroom could have been on the first floor, where I wouldn't have to use the elevator or wouldn't have to walk up and down the stairs if there's a fire drill or when it's time to escort students to related arts areas." (Pl. Dep. 131:14-19.) However, the Plaintiff was allowed to use the elevator if she was not accompanied by students. (Pl. Dep. 132:10-14, 134:13-15, 135:18-21.) She believes her non renewal was based on her physical limitations "[b]ecause in certain instances I couldn't do my job effectively, I needed to sometimes take medication, and I was in pain a lot." (Pl. Dep. 132:3-9.)

### The Plaintiff's Evidence of Gender Discrimination

The Plaintiff testified that Winbush terminated her because she was female. (Pl. Dep. 110:11-17, 113:14-16.) She explained: "Only African American female continuing contract teachers were placed on formal evaluation." (Pl. Dep. 137:16-18.) The Plaintiff believes that Winbush did not renew her contract because she was female; the fact that Winbush signed the April 4, 2012 letter and did not return her emails is evidence of gender discrimination, because "[h]e would not have dialogue with me concerning my issues." (Pl. Dep. 137:23–138:6.)

16

**The Law**

**Proving Discrimination**

The Plaintiff filed her race and gender discrimination claims under Title VII[8] and § 1983,[9] her age discrimination claim under the ADEA,[10] and her disability discrimination claim under the ADA.[11]  The Plaintiff may prove discrimination under each of these statutes through direct evidence or indirectly through the burden-shifting framework set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (ADEA); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (42 U.S.C. § 1983); *McDonnell Douglas Corp.*, 411 U.S. at 802-07 (Title VII); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (ADA).

---

[8] Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e–2(a)(1).

[9] To state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) that he or she "has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States," and (2) "that the conduct complained of was committed by a person acting under color of state law."  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C. § 1983).

[10] The ADEA prohibits an employer from discriminating against an employee who is 40 or older because of her age.  29 U.S.C. §§ 623(a), 631(a).

[11] The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

The court finds that the Plaintiff has not presented any direct evidence of race, age, disability, or gender discrimination.[12]  *See, e.g., Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citation omitted) (holding that direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.").  Therefore, the court will analyze the Plaintiff's claims under the burden-shifting framework set forth in *McDonnell Douglas*.  Under this paradigm, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Hicks*, 509 U.S. at 506.  If the Plaintiff can set forth each of the elements of a prima facie case of discrimination, the burden then shifts to the CCSD to produce evidence of a legitimate, nondiscriminatory reason for terminating the Plaintiff that, "*if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *Id.* at 507.  This is a burden of production, not of proof or persuasion, because "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.* (quoting *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If CCSD carries this burden, then the burden shifts back to the Plaintiff to prove that these asserted justifications are pretextual.  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 575-76 (4th Cir. 2015) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).  Among other methods, the Plaintiff may do so by demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation.  *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 647 (4th Cir. 2002).

---

[12] To the extent that the Plaintiff relies on statements from Ellen Plaxico, Latrea Hutchinson, and Kathleen Johnson to support her claims of discrimination, the court notes that, even assuming these statements were made, these statements are inadmissible hearsay.

18

### The Prima Facie Case

"The elements required to establish a discrimination claim are the same" under Title VII and § 1983. *Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F. Supp. 2d 717, 724 (E.D. Va. 2013) (citations omitted). To establish a prima facie case for race and gender discrimination, the Plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Goode v. Cent. Va. Legal Aid Soc'y, Inc.,* 807 F.3d 619, 626 (4th Cir. 2015) (citation omitted). To establish a prima facie case for disability discrimination in a case of alleged wrongful discharge, "a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (citations omitted). To establish a prima facie case for age discrimination, the Plaintiff must show: (1) she is at least 40; (2) an adverse employment action; (3) satisfactory job performance; and (4) that similarly-situated younger employees received more favorable treatment. *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F. Supp. 2d 500, 513 (D. Md. 2011) (citing *Reeves*, 530 U.S. at 142).

With respect to the Plaintiff's allegations of race, age, disability, and gender discrimination, the court finds that the Plaintiff is a member of a protected class. In addition, the court finds that the Plaintiff suffered an adverse employment action when her contract was not renewed by CCSD. However, the Plaintiff cannot show that her job performance was

satisfactory at the time her contract was not renewed.  "An employee may establish that [s]he was meeting h[er] employer's expectations by: (1) pointing out concessions by h[er] employer that [s]he was performing satisfactorily at the time of the dismissal; (2) offering evidence of h[er] prior satisfactory performance reviews; or (3) providing expert testimony as to the employer's performance expectations and an analysis of h[er] performance in light of those expectations." *King v. Rumsfeld*, 328 F.3d 145, 149-50 (4th Cir. 2003).  The evidence that the Plaintiff offers to support her argument that she was meeting CCSD's job expectations falls woefully short of what the law requires.  The Plaintiff claims in her Memoramdum that she is an "effective" and "exemplar teacher."  (Pl. Am. Mem. 1-4, Dkt. No. 56.)  However, on a motion for summary judgment, a plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations."  *King*, 328 F.3d at 149 (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) (citations omitted) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")).

The Plaintiff also has submitted an affidavit from her SCEMS colleague, Latrea Heyward, which praises the Plaintiff's teaching style.  (Heyward Aff., Dkt. No. 55-1.)  It is well-settled, however, that in a wrongful discharge action, "[t]he alleged opinions of [the Plaintiff's] co-workers as to the quality of her work are . . . close to irrelevant."  *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir. 2000) (citations omitted).  It follows, then, that the Heyward affidavit, as well as the affidavit from SCEMS parent Cindell Parker (Dkt. No. 55-1 at 7) are "close to irrelevant" and cannot be considered by the court to raise a genuine issue of material fact.

The Defendants have offered evidence of the Plaintiff's poor job performance as a legitimate, nondiscriminatory reason for not renewing the Plaintiff's teaching contract for the 2012-2013 school year.  In their initial evaluation, the Plaintiff's evaluation team (Dixon, Butler, and Vaughn-Brandon) found that the Plaintiff had met only twelve of the thirty-four criteria, and then, in a subsequent evaluation three months later, found that Plaintiff had not even maintained that level, but had dropped to achieving only ten of the thirty-four criteria.  (Dixon Aff. ¶¶ 9-10, 20.)  The Plaintiff was not performing her job in a manner satisfactory to her employer.  (Dixon Aff. ¶¶ 11-13; Herscher Aff. ¶¶ 7-11; Butler Aff. ¶¶ 8-15.)  Job performance is well-recognized as a valid, non-discriminatory basis for an adverse employment decision.  *Evans*, 80 F.3d at 960 (citations omitted).

Furthermore, the Plaintiff has not suggested that Dixon, Butler, or Vaughn-Brandon exhibited any discriminatory animus towards her.  Moreover, she has not shown any irregularity in the evaluation process.  Bates, who is the CCSD's Director of the Office of Teacher Effectiveness, averred:

> I have reviewed the dossier containing all of the documentation accumulated and created as part of [the Plaintiff's] formal evaluation during the 2011-2012 school year.  I believe that the evaluation was conducted in accordance with the ADEPT regulations [South Carolina's teacher evaluation system] and without any departure from those regulations.

(Bates Aff. ¶¶ 3-4, 18, Dkt. No. 49-6.)

Based on the foregoing, the court finds that the Plaintiff has failed to submit evidence sufficient to create a genuine issue of fact as to the performance prong of her prima facie case of race, age, disability, and gender discrimination.  Therefore, based upon the court's *McDonnell Douglas* analysis, it is recommended that summary judgment be entered in favor of the

Defendants on the Plaintiff's first four causes of action (race discrimination, age discrimination, disability discrimination and gender discrimination).

### Retaliation

The Plaintiff's final cause of action is one for retaliation under Title VII.  In pertinent part, Title VII's "antiretaliation provision . . . prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual . . .'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  "[R]etaliation claims may proceed under the direct method or under the prima facie method [of proof]." *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 824 (E.D. Va. 2016) (citations omitted).  Direct evidence of a retaliation claim would include "statements by an employee's supervisors that are generally discriminatory or statements by supervisors that indicate that their actions were motivated by the employee's race or sex, or in retaliation against filed EEOC claims." *Hinton*, 786 F.3d at 824-25 (citation omitted).  If the Plaintiff cannot show direct evidence of retaliation, she may satisfy the burden-shifting proof scheme established in *McDonnell Douglas*. *Dowe*, 145 F.3d at 656.  To show a prima facie case of retaliation in violation of Title VII:

> [A] plaintiff must prove (1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events.

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (internal quotation marks and citations omitted).  If the Plaintiff shows, by a preponderance of the evidence, a prima facie case of retaliation, then "the burden shifts to [CCSD] to rebut the presumption of retaliation by articulating non-retaliatory reasons for its actions." *Dowe*, 145

F.3d at 656. "If [CCSD] meets its burden of production, the presumption raised by the prima facie case is rebutted and 'drops from the case,' and [the Plaintiff] bears the ultimate burden of proving that she has been the victim of retaliation." *Id.* (citations omitted.).

The Plaintiff alleges that after she received a job offer to work as a long-term substitute teacher, CCSD rescinded the offer in retaliation for her filing her EEOC complaint. (Compl. ¶¶ 37-45.) The Plaintiff speculated at her deposition that "there may have been three principals that had a discussion . . . with [Jennifer Coker,] that principal at the Jenkins Academy or whatever the name of the school is now." (Pl. Dep. 141:12-17.) However, the Plaintiff admitted that she was not present during the discussion and had no idea what had been discussed. (Pl. Dep. 141:20-25.) She further said she had no idea whether the school principal, Jennifer Coker, knew of the EEOC charge. (Pl. Dep. 142:11-16.)

As mentioned previously, on January 8, 2014, Jennifer Coker, the Principal of CCSD's Daniel Jenkins Academy, interviewed the Plaintiff for a long term substitute teaching position at that school, and learned that Anthony Dixon had been the Plaintiff's Principal at SCEMS. (Coker Aff. ¶¶ 1, 3-4, Dkt. No. 49-14.) Shortly thereafter, Coker attended a CCSD principals meeting; Dixon also attended. (Coker Aff. ¶ 5, Dkt. No. 49-14; Dixon Aff. ¶ 25, Dkt. No. 49-8.) Coker asked Dixon about the Plaintiff, and the only comment Dixon made was, "Ms. Marzett had performance issues." (Coker Aff. ¶ 5, Dkt. No. 49-14; Dixon Aff. ¶ 25, Dkt. No. 49-8.) At the time this conversation occurred, Dixon was not aware that the Plaintiff had filed a complaint with the EEOC or "even that she believed her non-renewal to be discriminatory." (Dixon Aff. ¶ 25, Dkt. No. 49-8.) Likewise, at the time Coker decided to rescind the offer she had made to the Plaintiff, Coker did not know that the Plaintiff had filed a complaint with the EEOC. (Coker Aff.

23

¶ 8, Dkt. No. 49-14.)  The Plaintiff has failed to establish the "causal link" between her EEOC filing and CCSD's rescission of her job offer.  Therefore, she has failed to set forth a prima facie case of retaliation, and it is recommended that the Defendants be granted summary judgment on the Plaintiff's Fifth Cause of Action.

## **<u>CONCLUSION</u>**

Wherefore, it is **RECOMMENDED** that the Defendants' Motion for Summary Judgment (Dkt. No. 49) be **GRANTED**.

IT IS SO RECOMMENDED.

January 27, 2017

Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4ᵗʰ Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).